E. C. TOURTELOT, Receiver, v. LOUIS A. REED and Another.[1]

SAME v. M. A. PAULSON and Another.

Nov. 11, 1895.

Nos. 9530–9531—(83–84).

**Promissory Note—Bona Fide Purchaser.**

In an action by an indorsee for value before maturity of negotiable paper, *held*, that there was no evidence to impeach the good faith of the indorsee in the purchase of the paper.

**Same—Accommodation Paper.**

Mere notice that a note is accommodation paper will not prevent an indorsee for value in the ordinary course of business from being a bona fide purchaser, nor impose upon him the duty of inquiring as to the particular purpose for which it was executed. In the absence of notice to the contrary, he has a right to assume that it was executed for the purpose of being sold or discounted by the payee in the usual course of business.

**Same—Good Faith of Purchaser.**

Neither is it sufficient, to affect the title of an indorsee for value before maturity, that there were circumstances known to him that would have put a reasonably prudent man upon inquiry, unless these circumstances were such as to justify the conclusion that the absence of inquiry amounted to bad faith,—that the abstinence from inquiry arose from a belief or suspicion that inquiry would disclose a vice in the paper. Under the rule applicable to the transfer of negotiable paper under the law merchant, the question is one of good or bad faith, and not of diligence or negligence.

Appeals by plaintiff in each of the above-entitled actions from orders of the district court for Hennepin county, Elliott, J., granting the motion of defendant Reed in the first action and of defendant Paulson in the second action for a new trial.    Reversed.

*Bunn & Hadley* and *Winthrop G. Noyes*, for appellant.

*Louis A. Reed*, respondent, pro se.

*Henry J. Gjertsen*, for respondent Paulson.

MITCHELL, J.    The questions presented by these appeals are so nearly identical that the two cases can be considered together.    The actions were brought by the plaintiff, as receiver of the Chemical National Bank of Chicago, upon negotiable promissory notes executed

[1] Reported in 64 N. W. 928.

by the defendants, respectively, to one Blethen, and by him indorsed and transferred before maturity to the bank named.

In both cases the substance of the answers was that Blethen informed the defendants that he held $1,000 of the stock of the Bank of New England, which he desired to "carry along" until he could find a purchaser therefor, and requested the defendants, respectively, to permit the stock to be transferred to them, and to execute their promissory notes therefor, and then assign the stock as collateral security for the notes, and promised that if they would do so he would keep and hold the same in his possession, and take care of said notes and stock, and carry the same along in that way until said stock could be sold and disposed of to a purchaser, * * * and that the defendants should not be liable to pay said notes, or pay for said stock, and when the stock was so sold or disposed of, said notes should be surrendered to the defendants, and the stock reassigned; that, under this agreement, they executed the notes, without consideration, and merely for the accommodation of Blethen; that Blethen, in violation of the terms of this agreement, transferred the notes to the Chemical National Bank, which had notice of the purposes for which, and the terms and conditions upon which, the defendants had executed them. Stripped of mere verbiage, the defense thus attempted to be set up is that the defendants executed the notes for the mere accommodation of Blethen, but under an agreement that he was not to use or negotiate them, and that the bank had notice of these facts when it bought the paper.

The cases were tried by a referee, who found that the notes were executed "under the circumstances and conditions stated in the answers, and not otherwise," but that the bank discounted them in the regular course of business, without notice of the limitations or restrictions as to their use. On motion of defendants, the district court granted new trials on the ground that the notes were "discounted by Blethen in violation of the agreement between him and" defendants, "and the bank had notice of facts which were sufficient to put it upon inquiry as to the equities between the maker and the payee."

The defense attempted to be set up, that the notes were executed for the accommodation of Blethen, but under an agreement that he was not to use or dispose of them, involves a solecism. Of what accommodation they would be to him, if he was not to use them, the defend-

ants suggest no reasonable or intelligible explanation. If the referee's finding is to be construed as meaning that this was the agreement, it has very slight evidence to support it; in fact, in the Paulson case, none at all, for he himself admits that it was the understanding that Blethen was to use the note, and that he supposed that money was to be raised on it. In the Reed case, the evidence was very little stronger, for, while he testified that Blethen was to "keep" the note, and take care of it, until he could dispose of the stock, he also testified that it was executed as an accommodation to Blethen, who was to take care of the note when it became due, and pay it if it had to be paid. To whom it would have to be paid, or how it was any accommodation to Blethen, if he was not to use it, is not apparent.

But, as counsel for plaintiff seem to concede that the finding of the referee amounts to a finding that the use of the paper by Blethen was a diversion of it from the purpose for which it was executed, and that such finding is conclusive on the plaintiff on these appeals, it is only necessary to consider the evidence as to the bona fides of the bank in discounting the paper. The evidence is undisputed that it discounted the notes before maturity in the regular course of business, and paid a full and valuable consideration for them. This, of itself, is strong evidence of good faith. The cashier, who transacted the business for the bank, testified that the only information he had in regard to the notes and the conditions under which they were made was the contents of the letters of Blethen; that he had no conversation with Blethen in regard to them prior to the discount. We can find nothing in the letters calculated to suggest to the mind of the cashier the existence of any agreement between the defendants and Blethen that the latter was not to use the notes. Undoubtedly, these letters were sufficient to advise him that the notes were accommodation paper. But notice of that fact will not prevent an indorsee for value in the ordinary course of business from being a bona fide holder. The very purpose of executing accommodation paper is to enable the payee to use it by sale or discount. Neither does notice that a note is accommodation paper impose upon a purchaser the duty of inquiring as to the particular purpose for which it was executed. He has a right to assume, in the absence of notice to the contrary, that it was executed for the very purpose of raising money on it by sale or discount in the ordinary course of business.

Neither is it sufficient, to affect the title of an indorsee for value before maturity, that there were circumstances known to him that would have put a reasonably prudent man upon inquiry, unless these circumstances were such as to warrant the conclusion that the absence of inquiry amounted to bad faith,—that the abstinence from inquiry arose from a belief or suspicion that the inquiry would disclose a vice in the paper. The question is one of good or bad faith, and not of diligence or of negligence. The defendants rely chiefly upon the testimony of Blethen as to a conversation he says he had with the cashier two or three months before the paper was discounted, in which he talked with him about discounting some paper at the Chemical National Bank. He testified as follows: "I then explained to him that the amount would be in the neighborhood of $10,000, and that most of the stock was taken by parties who expected to pay the notes at their maturity, and receive the stock as their own, but there were a few who were unable to take the stock at that time, and would still be unable to at maturity of the notes, which might be placed with me; and that there were two parties who already had all the stock they desired, but had accommodated me in that way, and were willing to continue to do so, but that I expected to pay these notes myself, and place the stock elsewhere. I named Mr. Fred Barrows and Mr. Reed as the two parties who would not pay their notes at maturity." This would advise the cashier that some of the makers of the paper were not able to, and did not intend to, buy the stock, but had merely executed their notes to accommodate him (Blethen), and also that some of the parties would be unable to pay their notes at maturity; but we see nothing in it to suggest to the mind of the cashier anything so extraordinary and improbable as that, although these men had executed their notes for Blethen's accommodation, they had done so upon condition that he should not use the paper. The reference to Reed and Barrows would not suggest such a thing. Taken in connection with what had preceded, it merely amounted to a designation of them as the parties who did not intend to buy the stock, and would be unable to pay their notes at maturity.

Counsel for defendants assume that the execution of these notes was a transaction between the New England Bank, of which Blethen was president, and the defendants, and amounted to a scheme on part of that bank to use the notes as a show of assets, so as to make it ap-

pear that stock issued by it had been paid for, when in fact it had not. But there is no basis for this in the evidence. The transaction was between Blethen, individually, and the defendants, and the notes were executed for his personal accommodation. The stock in the New England Bank was held by Blethen. He may not have paid for it, and, if not, the purpose of the execution of the accommodation paper might be, and probably was, to enable him to raise money on the paper with which to pay for the stock until he could sell it. Where men have signed negotiable paper, which has been discounted or sold for value before maturity in the ordinary course of business, it requires something more tangible in the way of evidence to impeach the good faith of the indorsee than is found in this case in order to defeat his recovery.

Orders granting new trials reversed.