# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF MINNESOTA.

E. C. TOURTELOT, Receiver, v. JOHN B. BUSHNELL and Another.[1]

July 17, 1896.

Nos. 10,087—(263).

**Accommodation Note—Innocent Purchaser.**

*Held* (following Tourtelot v. Reed, 62 Minn. 384), that mere notice to an indorsee of negotiable paper for value, before maturity, in the usual course of business, that the same is accommodation paper, will not, without more, prevent him from being an innocent purchaser in good faith, and that the evidence is conclusive that such indorsee in this case was such an innocent purchaser.

Action in the district court for Hennepin county by plaintiff, as receiver of the Chemical National Bank of Chicago, against John B. Bushnell and Alden J. Blethen. From an order, Smith, J., denying a motion for a new trial, defendant Bushnell appealed. Affirmed.

*James O. Pierce*, for appellant.

*Hadley & Armstrong*, for respondent.

COLLINS, J. This is an action on a promissory note for $1,000, made by the defendant to the order of Alden J. Blethen, and indorsed by him before maturity to the Chemical National Bank of Chicago. It is one of a number of notes of the aggregate amount of $10,-

[1] Reported in 68 N. W. 104.

66 M.—1

000, which were so indorsed by Blethen to that bank, as stated in the opinion in the cases of Tourtelot v. Reed and Tourtelot v. Paulson, 62 Minn. 384, 64 N. W. 928. The two notes there in suit were of the number, and the facts in this case are very similar to the facts in those cases, to which we refer. On the trial the court ordered a verdict for plaintiff, and from an order denying a new trial defendant appeals.

Blethen was president of the Bank of New England, which was about to increase its stock from $50,000 to $100,000. One thousand dollars of this increase stock was issued to defendant, who executed his promissory note for the same to Blethen. The note in suit is (as defendant testified) a first or (as Blethen testified) a second renewal of that note. Defendant testified:

"Mr. Blethen came to my office, I think, on the 22d day of June, 1892, and stated to me that he was trying to raise an additional amount of capital to make the capital of the bank $100,000. He brought with him a certificate of stock—$1,000—in the Bank of New England, made in my name, and brought with him a note, and requested me to let the stock be put in my name, and to give him this note. I demurred about it, and he said it would be an assistance to him in making up the capital stock, and he would be able soon to sell the stock to some one, and return me my note. * * * He agreed at that time that the note should not go out of the bank; that the stock should not be considered as sold stock, but that in some way it would assist him in making up the capital stock of the bank. * * * At the time I gave that first note for $1,000, Blethen stated to me that this note and this stock would not be used to raise money on anywhere; that he would keep it in the Bank of New England until he found a purchaser for the stock; and I gave that note in reliance upon those assurances. * * * The purpose or object named for the taking of this note was to make an appearance that the stock was taken in the bank, so that he could do business as a banker. * * * It was not my understanding that this was to be discounted in the Bank of New England. Mr. Blethen was merely to hold the note for the stock. * * * The only reason he gave me for wanting a renewal was simply that the note was lying there past due. It was not to be used. As to what difference it makes whether it was past due or not, I suppose it would look better not to be past due. There was nobody going to see it unless he exhibited it to somebody. Q. There was nobody unless he used it? A. Unless he used it to deceive somebody. * * * I cannot say whether the original note came back with an indorsement upon its back, showing that it had been sent to New York. * * * I did not know that the first note for which this was a renewal had been sent to New York until within a day or two before this day."

Blethen was called as a witness for defendant, and testified:

"At the time I asked Mr. Bushnell for the original note of this $1,000 series, I explained that we were raising the capital from fifty to one hundred thousand dollars, and that all the capital could not be sold to persons desiring the stock before the date named for raising the capital, namely, the 28th day of July, 1892, and that I should be compelled to have some accommodations, and that I wanted him to lend me his name on this stock until I could place it elsewhere, or words to that effect. I don't think I explained to him what use I expected to make of the note further than that; that I must have the money in order to increase the stock to the proper limit; that no stock could be issued except paid for, and that it must be paid for before the day of raising the capital, otherwise the bank commissioner would not issue the charter for additional capital. It is my recollection that the stock was in one certificate for ten shares. I took it to Mr. Bushnell. He was compelled to indorse it in blank, that it might be used, or indorse it, not necessarily in blank. He gave nothing else for the stock, except this note. I then sent the note to New York, and got money for the Bank of New England as the proceeds of the sale of the stock which went to make the fund that formed the increase of stock. I think I got that remittance for the Bank of New England in the early part of July. * * * That was simply placed to the credit of the Bank of New England by the U. S. National Bank of New York, which was our correspondent there. When that first $1,000 note matured, I simply furnished a renewal. * * * I sent down a new note of Mr. Bushnell's of the same kind. I sent some other notes also. I did not send a note of somebody else in place of Mr. Bushnell's. * * * The money realized on this note went to pay the former note. It was simply a continuation of the same credit. * * * The proceeds of the note in question went to pay the U. S. National Bank for the taking up of a note which they renewed. The proceeds from the first note made at the time of the raising of the stock was a part of the capital stock paid in, and went at once to the bank. * * * I told him [defendant] I wanted this [original] note to get money on, but I also told him that I would take care of the note myself, and that he should never be called on to pay the money for that stock. It was practically an accommodation note to me."

We can hardly see how, under the circumstances, the note in suit was even an accommodation note. The defendant had already become liable to the New York bank on the original note, the proceeds of which paid for the stock held by him, and the note in suit was used to raise money to pay his prior obligation. But it is not necessary to decide that question, or place the decision on that ground, and we will not. The evidence above recited is also a sufficient answer to defendant's contention that the stock issued to defendant

was issued without being paid for, and therefore void, under G. S. 1894, § 2498, of which the Chemical Bank had notice. Instead of showing the contrary, the evidence shows that the stock was fully paid for when issued.

As held by us in the other cases, we are of the opinion that the evidence is conclusive that the Chemical Bank is an innocent purchaser for value, before maturity, and for the reasons there stated. The evidence bearing on that question is substantially the same here as there, and it is unnecessary to repeat it. The only point of difference necessary to note is that on the trial of this case Blethen testified: "I did not intimate to him [Braden] at that time, or at any other time, that I did not have the right to discount this paper."

The order appealed from is affirmed.