MAY LUNDEAN, Appellee, v. W. S. HAMILTON et al., Appellants.

CANCELLATION OF INSTRUMENTS: Burden of Proof. The burden of proof that rests upon the transferee of a fraudulent negotiable instrument, to prove, when he is a plaintiff *at law* on the instrument, that he is a holder in due course, equally rests upon

such transferee when he is a defendant in an action *in equity* to cancel such·instrument by reason of the fraud.

SALINGER, J., dissents.

**BILLS AND NOTES:** Evidence Bearing on Good-Faith Holdership.
2  On the issue whether a holder of a note is a holder in due course, material inquiries are:

1. Whether the holder had knowledge, and if so, what knowledge, of the original execution of the note.

2. Whether the holder took the note from the payee in part payment of a claim of doubtful collectibility.

3. Whether the holder's name had been forged as a witness to the security.

4. Whether the note was in excess of the security, the note being a loan.

5. Whether the holder made inquiry concerning the security.

6. Whether the holder wilfully omitted to make inquiry concerning the validity of the note.

SALINGER, J., dissents as to the application made.

*Appeal from Pottawattamie District Court.*—J. B. ROCKA-
FELLOW, Judge.

OCTOBER 29, 1918.

SUIT to cancel note and mortgage resulted in decree as prayed. Defendants appeal.—*Affirmed.*

*H. L. Robertson* and *L. W. Schneider,* for appellants.

*Tinley, Mitchell & Pryor,* for appellee.

LADD, J.—The plaintiff owned the east 40 feet of Lot 18 of Block 15, Mill Addition to the city of Council Bluffs. On December 12, 1912, she signed a mortgage thereon, se-

1. CANCELLATION OF INSTRUMENTS: burden of proof.
curing the payment of a promissory note for $3,600, of even date, and payable three years thereafter. The name of W. S. Hamilton, as payee in the note and mortgage, may have been inserted later. The mortgage purported to be witnessed by Hamilton and C. E. Price, defendant, before

whom, as notary public, it was acknowledged, January 14, 1913. It was recorded on the same day. About that time, Hamilton applied to the defendant bank for a loan; and, on January 30th following, executed his note to the bank for $2,800, payable 4 months after date, and deposited the note and mortgage heretofore mentioned as collateral security, and in consideration thereof, the bank surrendered a note of his to it of $500 and accrued interest, and entered to his credit $2,286, which Hamilton subsequently checked out. In this suit, plaintiff prays that this note and mortgage be cancelled and surrendered to her; for that, as is alleged, these were procured by Hamilton through the perpetration of fraud; that Price participated therein; and that the bank is not an innocent purchaser; and that the note is not negotiable.

The last-named contention is disposed of by *Des Moines Sav. Bank v. Arthur,* 163 Iowa 205, 211, and no further attention need be given to it. The other two issues may be considered together. The record leaves no doubt that Hamilton procured the note and mortgage without parting with any consideration, and with the fraudulent purpose of depriving the plaintiff of said note and mortgage and appropriating the same to his own use, though inducing the plaintiff to rely on what he did in handling the note and mortgage as in her interest, and with the design of turning over the money to her. This is clearly within the allegation of the petition, though it alleged that Price and Hamilton entered into a fraudulent combination to accomplish this, and so did. The evidence did not warrant the inference of such combination with fraudulent purpose, but did justify the inference that Hamilton had fraudulently procured and appropriated the note and mortgage.

Mrs. Lundean had been engaged in dressmaking, first for herself and later as an employee of John Beno Company, since the death of her husband, some 15 years ago, except

about 3 years, a part of which time she was trying to regain her health in Colorado, and the rest, was engaged in office work. She had supported herself and son, 18 years of age, at the time of the trial, and paid off a $1,000 mortgage on the premises heretofore described. She met Hamilton late in 1911, through his wife, whom she had known prior to their marriage. Her mother, in California, had been urging her to sell her home and take up her residence at Berkeley in that state, in order to continue the education of her son and make a home for her mother. She testified that Hamilton, upon hearing this, proposed selling the place, which she authorized; but instead, submitted opportunities for exchange, and, when these did not meet with her approval, suggested that she put a loan on the place and rent it, and said that she would receive as much in that way as by selling. This did not meet her approval at first; but, upon receiving another letter from her mother, his proposition that she make a $3,500 loan, and suggesting that, "if the worst should come to worst, Mrs. Lundean, if they take the place, I would not feel I had cheated them out or they had cheated me out," was acceded to; and he led her to believe that he was making loans through a Kansas City, Missouri, house. She testifies, further, that later, he reported that her "loan is coming through, and the money will come to you through the bank, the Commercial National Bank;" that he repeated this several times; that, one day, Hamilton telephoned her to come to the Commercial National Bank, and she did so; that Hamilton and Price were there; that the former said:

"I know your time is very limited, and all we will ask you to do is to sign this paper. You will have to sign this paper before your money can come, and it will come through the bank."

She then described how they were sitting,—Price at his desk and Hamilton across the aisle in a small room; that,

as she sat down at the desk, Price stood, remarking, "Sign your name on this line, Mrs. Lundean" (pointing to the line) ; that Hamilton requested that she sign her name "Mary," as it appeared that way in the abstract; that, after so signing, she inquired if there was anything further, in response to which she was told that the paper could be finished after she left.   On further inquiry, she repeated that Hamilton told her, in Price's hearing, that the money was coming through the bank, and that he said "Commercial National Bank;" and she swore that she had no recollection concerning the signing of the note, and heard nothing further of the transaction until May, 1913, when Mrs. Hamilton informed her of the transfer of the note and mortgage to the bank.   The evidence further shows that she trusted Hamilton implicitly; that she had no recollection of signing the note; that there was never any conversation between her and Hamilton concerning a loan for $3,600; that their conversation was concerning a $3,500 loan; that at no time had a loan from Hamilton or in his name been mentioned: and the witness testified that she supposed it was an application for a loan, and not a mortgage, which she acknowledged before Price.   The record leaves no doubt that Hamilton procured the signing and acknowledgment of the papers with the design of defrauding the plaintiff.

In the first place, he pretended to be obtaining the loan through a Kansas City firm, when, in fact, he prepared the papers with his own name inserted as payee and mortgagee, without so informing her, or drew them in blank, and afterwards inserted his name.  Of course, she could read; but he so planned the signing and acknowledgment of the papers that she would not be likely to read, and did not.   In this way he procured the papers to be drawn to himself and to be left in his custody, in order to obtain and appropriate the proceeds of the loan, rather than to obtain a loan for the plaintiff.    That such a transaction is fraudulent re-

quires no argument to prove. The papers were not only procured by fraud, but were utterly without consideration. Hamilton's title, such as he had, then, was defective. Section 3060-a55, Code Supplement, 1913.

Having so shown, the plaintiff was entitled to a decree as prayed, unless defendant should be able to establish, by a preponderance of evidence, that the defendant bank acquired the papers without notice of such defect. Had suit been brought on the note, and fraud as here proven been interposed as a defense, this would have been the result. *Keegan v. Rock,* 128 Iowa 39; *McNight v. Parsons,* 136 Iowa 390; *Arnd v. Aylesworth,* 145 Iowa 185; *Farmers & Merch. St. Bank v. Shaffer,* 172 Iowa 173; *German Am. Nat. Bank v. Kelley,* 183 Iowa 269. The proof was such that, had the action been on the note, the petition must have been dismissed. If the proof would have been sufficient to establish a complete defense in an action on the note, certainly it was sufficient to justify a court of equity in cancelling such a note, with the mortgage securing its payment. Section 3060-a59 declares that:

"Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course. But the last-mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

The negotiable instrument statutes are not concerned with forms of action, nor the forums in which pending, but lay down general rules governing the rights of the respective parties thereto. Although every holder is deemed, *prima facie,* a holder in due course, this presumption is overcome by proof that the title of the person negotiating to him was defective. The instrument is then subject to the

same defenses as though non-negotiable (Section 3060-a58, Code Supplement, 1913); and if these defenses are complete, dismissal of the petition necessarily follows, in an action at law or decree of cancellation or other appropriate relief in a court of equity. The burden, then, was on defendants to prove that the bank was a holder in due course. The evidence that full consideration was paid to Hamilton by the bank is not disputed. Did the bank acquire these papers without notice?

2. BILLS AND
NOTES: evi-
dence bearing
on good-faith
holdership.

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Section 3060-a56, Code Supplement, 1913.

The transaction in behalf of the bank was through Price, then president thereof. He had known Hamilton for about two years, though not intimately, with the understanding that he was engaged in the real estate and loan business in Council Bluffs. He had had no personal transactions with him, nor for the bank, prior to this time, but seems to have been sufficiently familiar with Hamilton's personality to enable him to make a fair estimate of his character; for, according to the testimony of Mrs. Lundean, undisputed, Price remarked to her, shortly after she had been informed of the hypothecation of the note and mortgage with the defendant bank, that he "always knew he was a scoundrel and a rascal." Hamilton had borrowed $500 of the bank through the cashier, Konigmacker, about three months previous, with the names of his wife and one Solomon as sureties. The cashier testified that the bank had considered Solomon good security, but was unable to assign any reason for so thinking; and, when Hamilton applied for an additional loan on the same security, he

promptly rejected the proffer. But when Hamilton inquired, "Will you loan more money if I bring you good real estate mortgage?" the cashier responded, "Sure, sure, if you increase the security collateral, we will loan you the money." And Hamilton said he would bring the papers. The prior loan is of no little significance in this case, in view of the doubtful prospect of collecting it, and the security the tender of the note and mortgage as collateral afforded. With such a prospect before them, the cashier and president may readily be excused for many things, but hardly for overlooking the fact that Hamilton had forged Price's name as a witness to the execution of the mortgage, his name so appearing thereon, apparently, in Hamilton's handwriting, unauthorized by Price.

Nor could the fact that the face of the note was $100 in excess of the value of the property covered by the mortgage securing its payment well have escaped their attention; and it did not. Schnoor, called by defendant, estimated the value of the property at $3,500, though saying it might be worth as much as $3,800; and there was no other evidence on the subject; and Price was so informed by him before the loan was made to Hamilton. This situation quite naturally would excite inquiry as to how the loan came to be so large, as compared with the security, and whether the maker of the note was otherwise responsible. Nor would such paper ordinarily be regarded as sufficient for a loan of $2,800, save to accomplish some ulterior object, such as collecting a doubtful debt. But no inquiries such as are suggested were made, nor as to whether the premises were occupied, or constituted a homestead, or were productive in rentals. Again, if the plaintiff is to be believed, Price was aware that she signed the mortgage without reading it, and that she was advised, by what Hamilton said at the time, that the proceeds of the loan were to come to her through the defendant bank. She testified that the

mortgage was lying on Price's table, when she came to the bank to acknowledge it; he, that she brought it with her, and that it had been signed previously; she, that Hamilton was present; he, that he was not; she, that Price pointed where to sign, and that Hamilton told her to sign her full name, and that she left the paper for them to finish, at Hamilton's suggestion; he, that she took the mortgage away with her; she, that Hamilton remarked, in Price's presence, that she would "have to sign this paper before the money can come, and it will come through the Commercial National Bank;" and he, in effect, denied this, in saying that Hamilton was not present. Neither is corroborated. Nothing in the record indicates that one is more credible as a witness than the other; though the circumstances of what happened would be likely to be more strongly impressed on the mind of Mrs. Lundean, because of seldom occurring with her, and happening frequently with him. She would be likely to remember how she came to go to the bank,—as that Hamilton telephoned her,—and whether she took the papers over, and whether she signed them then, better than one continuously engaged in such matters.

We are inclined to accept her version of the transaction,—especially as this is in harmony with the finding of the district court, who heard the witnesses,—to the extent that she came to the bank at the instance of Hamilton, and there signed and acknowledged the mortgage, and left it with them, as she testified. Possibly Hamilton made the statement as to the money's coming through the bank; but, if so, the expression may not have been of a matter concerning which Price was then interested; and if not, what was said was hardly specific enough to advise him that the proceeds were to go directly to Mrs. Lundean. It is not to be overlooked, however, that the application of Hamilton for an increased loan, and his promise to bring in mortgage security for collateral, the signing and acknowl-

edging of this mortgage, and the submission of said mort-
gage by Hamilton to Price for acceptance as collateral se-
curity, occurred at about the same time. Konigmacker does
not give the date of his conversation with Hamilton when
the promise to furnish such collateral was broached; and
for all that appears, this occurred before the acknowledg-
ment of the mortgage, and was the immediate occasion
therefor. According to Price, Hamilton had said nothing to
him concerning the loan prior to the acknowledgment; but
he does not say that the cashier had not told him about it,
nor that he was not aware that the mortgage, when acknowl-
edged, was the one of which Hamilton had spoken to
Konigmacker. This evidence was available to the defend-
ant, and was not produced at the hearing. If aware that
the mortgage was acknowledged after being tendered as
security, Price's suspicions must have been aroused by the
circumstance of Mrs. Lundean's executing a mortgage to be
hypothecated as security for a loan to Hamilton.

Price testified that Hamilton first spoke to him about
the note and mortgage "about the time that I took the
acknowledgment to the mortgage—I say about the time,
but it may have been a day or two later,—I don't know. It
was within a few days after that;" and that Hamilton
brought the papers in; and also that he talked matters over
with the cashier. The inference that the talk concerning
the new loan between Hamilton and the cashier was prior
to the date of acknowledgment is strengthened by the cir-
cumstance that the mortgage and note were dated about
a month earlier; and this fact certainly must have been
known to the cashier when he counseled with Price con-
cerning the propriety of making the loan, whether before or
after the mortgage was acknowledged. At any rate, all
these matters happened so near the same time that the
bank cannot avoid being charged with knowledge of what
its officers ascertained, or responsibility for whatever they

did in its behalf; though appellant contends to the contrary. *Watt v. German Sav. Bank,* 183 Iowa 346.

That Price was not content further appears from the circumstance that, after Hamilton had submitted the note and mortgage, Price called on Mrs. Lundean at the Beno Company's establishment, and asked her if she was Mrs. Lundean; and, on being informed by her that she was, either remarked that he wished to be sure he knew who she was, and walked away, as she testified, or asked her if she was the person who signed or acknowledged the mortgage or instrument, and left, as he testified; though he was unable to say whether he used the word "signed" or "acknowledged," or "mortgage" or "instrument." But he was certain that he had the mortgage in his hand and did not show it to her, and does not deny that he had known her by sight a long time, and that he had learned her name when he took her acknowledgment as "Mary Lundean," and that he knew that the paper Hamilton brought in was the one acknowledged by her before him. Why he did not exhibit the mortgage to her, and directly inquire whether she was the person whose name was attached, and who had acknowledged it, is not explained; nor does he give an intelligent explanation of this call on her. Asked how he happened to do so, he responded: "Oh, just in a general way,—taking all precautions possible." A more plausible response would have been that he went up to inquire about the mortgage, in connection with the matters heretofore mentioned. This was the natural thing for him to have done when talking to her; and, as he had the mortgage in his hand, why did he not do so? There is only one reasonable response, and that is that he feared he might learn of infirmities inhering in the paper. Counsel say that he made no other inquiries, for that to do so would not have been "good banking." This may have been true, as to the propriety of making any inquiry whatever of the maker of

the note and mortgage, in the absence of suspicious circumstances. But, in view of the facts to which we have adverted, then within his knowledge, the banking which would omit to obtain information from a source sought out by him, and with no other apparent purpose than to acquire it, is to be denounced as untrustworthy; and the only reasonable inference therefrom is that such omission was in the fear that, upon inquiries, he would ascertain the truth concerning the note and mortgage up to that time. Had he exhibited the mortgage, she would have discovered that it was drawn to Hamilton as mortgagee; and this would undoubtedly have led to his discovery that Hamilton had no such title as would enable him to hypothecate it as collateral security, and the opportunity to collect the $500 note would have gone glimmering. This is not a case of mere carelessness about making inquiry, or lack of prudence in not giving heed to matters which might put an ordinary person on inquiry, but of a wilful omission or neglect to make inquiries, for fear of ascertaining facts which would prevent him from assuming the attitude of an innocent purchaser, should he acquire the note and mortgage as collateral security, or as holder. One may not, with knowledge of facts which cast doubt on the holder's title, and which excite suspicion to such an extent that he fears to investigate, lest a defense be disclosed, cautiously close his eyes, and act in the dark in taking over negotiable paper, and thereby become a purchaser in good faith. *Knowlton v. Schultz,* 6 N. D. 417 (71 N. W. 550) ; *Schmueckle v. Waters,* 125 Ind. 265 (25 N. E. 281) ; *Bowman v. Metzger,* 27 Ore. 23 (39 Pac. 3) ; *Tourtelot v. Reed,* 62 Minn. 384 (64 N. W 928).

It is not enough that the purchaser be put on inquiry merely. The facts within his knowledge must be of such a character as to warrant the conclusion that he either actually knows of the infirmity, or, if he does not know,

that his abstinence from making inquiry arises from a belief or suspicion that inquiry would disclose such infirmity or vice in the instrument. See *Lehman v. Press,* 106 Iowa 389. This last was the situation in the case at bar.

With reference to the pleas of estoppel interposed, it is enough to say, as to the first, that, as we have assumed that plaintiff signed the note and mortgage, the plea based on the theory that plaintiff supposed she was signing an application for a loan, instead of these instruments, requires no attention; and, as to the second, that, if defendants obtained the instruments in bad faith, she would owe them no duty either of discovering their wrong or of saving them harmless. Even had she been as vigilant as it is claimed she should have been, the record warrants the conclusion that nothing could have been saved, through recovery from Hamilton, for either party. We are content with the decree of the trial court, and it is—*Affirmed.*

PRESTON, C. J., WEAVER, EVANS, and GAYNOR, JJ., concur.

SALINGER, J. (dissenting). Where the maker defends at law, and has evidence that the title of the payee is defective, the endorsee must show good faith. The question is whether that is the rule where the maker is plaintiff, and seeks the affirmative equitable relief of cancellation. The majority says the burden is assigned by the statute, and that the Negotiable Instruments Act is concerned with neither form nor forum, but lays down a general rule. It seems to me this may be well answered in two ways:

(a)    The evidence rule in question is not statutory; is but declarative of the common law. *Green v. Wilkie,* 98 Iowa 74, 87; *Voss v. Chamberlain,* 139 Iowa 569. Therefore, decisions on this point are applicable, even if made where there is no negotiable instrument statute. I submit it has been held that, even if the maker stops short of asking affirmative equitable relief, and but asks the opening

and closing argument, he must prove bad faith. *Cochran v. Priddy,* 49 Tex. Civ. App. 39 (107 S. W. 616). In effect, it is declared in Black on Bankruptcy, Section 716, that the burden shifts if relief such as cancellation is prayed.

(b) Rules of evidence found in negotiable instrument statutes apply only if a negotiable instrument be involved. The petition at first declared such an instrument existed. This declaration was expressly withdrawn by amendment alleging that the original declaration was put in under a misapprehension of both fact and law. It was also withdrawn because of allegation that plaintiff was tricked into signing negotiable instruments, under the belief she was signing nothing but an application for a loan. Inconsistency is permitted as to defenses only. Where an amendment to petition is inconsistent with the petition, the amendment becomes the basis of the suit. It follows that the amendment changed the suit into one to cancel because assent was lacking. If that be her suit, she cannot avail herself of evidence rules that apply to negotiable paper only; because it is overwhelmingly settled that, when one is tricked into signing what proves a negotiable instrument, he does not create negotiable paper.

"Negotiability * * * presupposes the existence of the instrument as having been made by the party whose name is subscribed; for, until it has been so made, and has such actual legal existence, it is absurd to talk about a negotiation, or transfer, or bona-fide holder of it, within the meaning of the law merchant." *Walker v. Ebert,* 29 Wis. 194; *Kellogg v. Steiner,* 29 Wis. 626; *Butler v. Carns,* 37 Wis. 61; *Kagel v. Totten,* 59 Md. 447.

It is only when the party sought to be charged intended to bind himself by some obligation in writing that a negotiable instrument may be created by him, and no negotiable instrument exists where there was no intention to create one. No contract can come into existence unless

the parties give assent; wherefore, if a paper is signed in the belief that it was not a negotiable instrument, it is as though no paper has been signed, for the reason that "the will does not go with the act." *Gibbs v. Linabury*, 22 Mich. 479, followed in *Anderson v. Walter*, 34 Mich. 113. To the same effect are cases too numerous to cite. One is *Green v. Wilkie*, 98 Iowa 74, at 80. All the text writers declare it. It was held as early as, if not earlier than, *Foster v. Mackinnon*, L. R. 4 C. P. 704, and is affirmed down to the last advance sheets. In principle, this is the ground taken in *First Nat. Bank v. Zeims*, 93 Iowa 140, at 145. A very strong case for this position is *Briggs v. Ewart*, 51 Mo. 245, followed in *Martin v. Smylee*, 55 Mo. 577, and *Corby v. Weddle*, 57 Mo. 452. In *Nance v. Lary*, 5 Ala. 370, the doctrine is applied to a case where the maker wrote his name on a blank piece of paper, of which another took possession without authority, and upon which he wrote a promissory note, which he negotiated to a good-faith buyer.

1a

· Since plaintiff seeks cancellation, and since she pleads that no negotiable instrument is in existence, it would seem to follow that she may not invoke a rule of evidence applicable to negotiable instruments only, and to follow, in turn, that plaintiff has the burden of proof on bad faith. If, then, the witnesses are of equal credibility, the plaintiff should fail. But, were the burden of the issue on defendants, still they should prevail, if their testimony be the more credible.

The majority holds that nothing in the record indicates one party to be a more credible witness than the other. What is the record?

(a) Plaintiff swore, in pleading, over and again, that she executed a note and mortgage. She testifies, in effect, that she signed no note. She knows, and the majority holds, she signed it.

(b)    She testifies Price told her, after he knew there was trouble, what would clearly prove he knew a fraud had been committed upon her in loaning Hamilton on her paper. It is incredible that a keen banker should do this, and let his money go, knowing this.

(c)    She swears, in pleading, that Price knew Hamilton well, and the two had been associated in various enterprises; that she knew nothing of Hamilton, and trusted Price.    The undisputed testimony, including her own, is that she knew Hamilton well; had had dealings with him before; relied on him implicitly; that she knew nothing of Price beyond knowing his name; and that Price had not been an associate of Hamilton's.    In the face of this, she testifies she relied on Price.

(d)    She admits she went into a deal with Hamilton which "did not look straight," and that she told Hamilton so.

(e)    Plaintiff testifies that, though she in fact signed a note and mortgage, she believed she was signing an application to a loan agency in Kansas City.    Plaintiff wants it believed, first, that she did not know, and had not experience enough to know, though an experienced business woman, that she was signing a mortgage; second, and still more incredible, that she did not know she was signing a note; third, that she believed what she signed,—to wit, *a mere application for a loan,* to a concern that had no relations with defendant bank,—would enable her to go to that bank and get her money.

No matter who has the burden of proof, the testimony for plaintiff is the less credible; and this is so though the trial judge saw the witnesses.    The majority treats that advantage possessed below as is done concerning a finding on the law side.    It has but little effect on hearing *de novo,* or it would not be a hearing *de novo.*    Even on the law side, that advantage would count for little against such im-

peachment of credibility as this record presents. See *Miller v. Paulson,* decided January 20, 1919.

II. I fail to understand why the majority cites cases such as *McNight v. Parsons,* 136 Iowa 390. They deal with what is enough to send bad faith of an endorsee to a jury. The question here is whether bad faith may be found on review *de novo.*

Since this suit no longer involves a negotiable instrument, the statute rule on proof of bad faith has no application. If that be passed, there is no evidence of bad faith.

The majority rightly concedes that many things are no evidence of bad faith. It bases its decision on *Lehman v. Press,* 106 Iowa 389; *Knowlton v. Schultz,* 6 N. D. 417 (71 N. W. 550) ; *Schmueckle v. Waters,* 125 Ind. 265 (25 N. E. 281) ; *Bowman v. Metzger,* 27 Ore. 23 (39 Pac. 3), and *Tourtelot v. Reed,* 62 Minn. 384 (64 N. W. 928),—all holding that one who has his suspicions aroused, so that he is afraid to investigate, may not cautiously close his eyes and act in the dark for the bad-faith purpose of making himself "an innocent purchaser :" that a purposed abstention from inquiry or further inquiry, in the belief that its making or pursuit would reveal an infirmity, may taint the purchase. Of course, I have no quarrel with this law, but find no facts upon which to apply it. All the evidence is this:

(a) There is a failure to prove that the suspicions of Price were not aroused by the fact that he was called upon as a notary to acknowledge the mortgage which Hamilton had offered defendant bank's cashier as collateral for a loan. The trouble is: (1) There is no evidence that the mortgage acknowledged was the one offered the cashier; (2) if it was the one, there is no evidence that Price knew it, and the majority finds that his acknowledging was a perfunctory act, that made no impression on Price, which finding is supported by undisputed evidence that Price would not know such a mortgage existed, were he not shown his

acknowledgment of it; (3) a request by Hamilton to acknowledge the execution of a mortgage running to Hamilton, and which he had offered for collateral, is not a ground for suspecting that he has no right to the mortgage. On the contrary, the rightful owner of a mortgage would want it acknowledged, if he desired to borrow on it.

(b) It is said that it is evidence of bad faith that a loan of $2,800 was made on this mortgage, which was for $3,600, and is said to be for $100 more than the mortgaged property was worth, and that reasonable inquiry would have disclosed this fact. I have to say: First, that the foundation of this argument is that a witness put the value at $3,500, adding that it might be worth $3,800; second, failure to make the inquiry is no evidence of bad faith; third, inquiry was made, and disclosed that the property was worth $1,200 or $1,300 more than the loan sought; fourth, in the view of the majority, plaintiff is not impeached for believing that this property was good for a loan of $3,500, and having attempted to make such loan, yet the bank is said to have acted in bad faith for treating the same property as good for $2,800.

(c) Another claim is that the bank loaned, and closed its eyes in doing it, because it feared to lose a $500 note made it by Hamilton, which was paid it out of said new loan. The major premise is not sustained by, and is contrary to, the evidence. The $500 note had sureties. Assume the presumption that all were solvent is overcome as to Hamilton, it still exists for his sureties. Both this presumption and affirmative undisputed evidence that the note was good, and that defendants considered it so, are swept aside on no more than the fact that the cashier was "unable to assign any reason" for thinking the note was good. It is also pointed out that the bank declined to make the $2,800 loan on the signers to the $500 note. I cannot understand how the fact that signers are declined on a note for $2,800 dis-

proves the testimony that they were good, and considered good, for $500. The petition charges actual fraud and conspiracy. It seems unbelievable the bank would be guilty of the charge, to save a $500 note. Certainly, it would not when the note was good. If this can be believed of the bank, certainly Price would not join in this crime to save a $500 note belonging to the *bank,*—and the majority finds that neither defendant is guilty as charged.

(d)  The next "evidence" of bad faith is that Price must have noticed that Hamilton had "forged" the name of Price as a witness to the mortgage. I think the record exhibits no "forgery;" beyond all question, Price did not notice it, if it existed,—and it requires more imagination than I possess to understand why one should want to forge the signature of Price to a paper *as a witness,* which Price had acknowledged as a notary.

(e)  The main ground upon which the majority places itself is that Price, for some reason, went to plaintiff, with the mortgage in his hand, and asked her whether she was the person who had executed same, but did not show her the mortgage. As to this, I have to say:  (1)  That the failure to show her the mortgage is an immaterial matter, because, if plaintiff can have any relief, it must be done by holding—as the majority does hold—that she knowingly executed note and mortgage, which would estop her to deny that she did not know what was in what she signed. Therefore, showing her the mortgage would but have disclosed what both she and Price knew, as matter of law.  (2)  For all that appears, the mortgage had already been bought. (3) Pass all that, and still it could not have been the purpose of Price to refrain from inquiry, and so make an "innocent purchase;" for, if that had been his bad-faith purpose, he would have made sure by keeping away altogether.

If statute "bad faith" were involved, it is not proved.

III.  The charge in the petition is that the defendants

were co-conspirators with Hamilton, to cheat and defraud plaintiff out of the proceeds of the mortgage. I shall not stop to elaborate upon the.proposition that the bank could not be a conspirator; that notice to Price, bank president, was not, in this matter, notice to the bank, because the authority of a bank president, as such, is exceedingly limited; and that, under a general rule in agency,—which is that it is not presumed the knowledge of the agent is the knowledge of the principal, when it is natural that the agent would conceal his knowledge,—the bank had no notice, even if Price knew anything, because it may well be presumed that, if he were guilty of the crime charged, he would conceal and not reveal it. I content myself on this head with pointing out that the majority finds the charge is not proven. While I agree to this conclusion, I cannot agree to the deduction that the relief granted "is clearly within the allegation of the petition." The petition charged actual fraud and conspiracy. A conclusion that the charge is not proved, should alone have sufficed to reverse a decree which finds the evidence to sustain what the majority holds it does not sustain,—and see *Wright, Dryden & Co. v. Flinn,* 33 Iowa 159, at 163.

IV. If it be conceded to be immaterial that this is a suit to cancel, instead of a defense asserting a bad-faith purchase; if it be, therefore, conceded that defendant has the burden of proof on good faith; if it be conceded that this is a suit involving the purchase of a negotiable instrument: yet all these concessions are immaterial, because plaintiff is seeking affirmative relief in equity. And she may not have such relief, if she negligently refrained from reading before she signed. Such negligence will bar such relief, even between the parties. She may not have the relief even against Hamilton. Therefore, she surely cannot have it against an endorsee who is not an actual participant in the fraud. If it was negligent not to read, equity will

deny relief because of such negligence, even between the parties. *Reid, Murdock & Co. v. Bradley,* 105 Iowa 220, 221; *Glenn & Pryce v. Statler,* 42 Iowa 107; *McKinney v. Herrick,* 66 Iowa 414; *Bonnott Co. v. Newman Bros.,* 108 Iowa 158; *Roundy v. Kent,* 75 Iowa 662; *Minneapolis & St. L. R. Co. v. Cox,* 76 Iowa 306, at 310; *Shores-Mueller Co. v. Lonning,* 159 Iowa 95. This last case was on the law side, and between the parties to the contract. It upholds that the signer is bound, unless signing without reading can be found to be no negligence, and then proceeds to say:

"We do not overlook the fact that many cases hold a contrary rule upon the theory that it is no defense for one guilty of a fraud to say that the other party was negligent in believing him. * * * But we have so long adhered to the doctrine just stated that we are not justified in departing from it now."

Quite a proportion of the cases involve innocent endorsees. But that makes no difference. For, as has been seen, when affirmative relief is sought in equity, even the one who is charged with having committed the fraud may say that the maker is, by negligence, barred from relief.

All that the opinion claims is that plaintiff came to the bank at the instance of a telephone message from Hamilton. When she arrived, Price was at his desk in a small room, and Hamilton, across the aisle. Hamilton said:

"I know your time is limited, and all we will ask you to do is to sign this paper. You will have to sign this paper before your money can come, and it will come through the bank."

As she sat down at the desk, Price, who was standing, remarked, "Sign your name on this line, Mrs. Lundean,"— pointing to the line. Then Hamilton requested that she sign her name "Mary," because it appeared that way in the abstract. After so signing, she inquired if there was anything further, and was told by Hamilton that the paper

could be finished after she left. Whereupon, she departed, and left the paper. There is nothing here to avoid the effect of signing without reading. This alone suffices to defeat the equitable relief prayed. A thousand cases hold that more than this will not avoid enforcement of what was signed. Included in them are *Van Slyke v. Rooks,* 181 Mich. 88 (147 N. W. 579) ; *McKinney v. Herrick,* 66 Iowa 414 ; *McCormack v. Molburg,* 43 Iowa 561; *Chirurg v. Ames,* 138 Iowa 697, at 708; *Gulliher v. C., R. I. & P. R. Co.,* 59 Iowa 416, at 422; *Wallace v. Chicago, St. P., M. & O. R. Co.,* 67 Iowa 547; *Jenkins v. Clyde Coal Co.,* 82 Iowa 618; *Soper v. Peck,* 51 Mich. 563; *Shores-Mueller Co. v. Lonning,* 159 Iowa 95, 100; *Green v. Wilkie,* 98 Iowa 74. It is not an avoidance of the failure to have read, that the other party directed the signer where to make erasure to clauses covering antecedent debts, and informed him that such erasure would strike all of them out, when in truth it struck out but one of them. *Reid, Murdock & Co. v. Bradley,* 105 Iowa 220, 221.

The majority has absolutely nothing to say against all this, unless it be the perfectly immaterial statement that the case is one in which it holds that plaintiff made a negotiable instrument, which Hamilton could not collect, and that the bank could not collect, because it had notice of the infirmity. As said, this is an immaterial statement: First, because, by amendment to petition, the plaintiff settled that there was no negotiable instrument, and the court may not act in disregard of this allegation, and for her benefit hold that she made a negotiable instrument; second, failure of the evidence to prove good faith is utterly immaterial, where the maker seeks affirmative relief in equity, and was negligent in signing without reading. As seen, this is so if Hamilton himself were defending this suit. Surely, what is true of a party to the fraud must be true of one whom the majority finds was not a party to the fraud. Surely,

one who merely fails to show he bought in good faith has as much standing as the payee who committed the fraud.

V. But assume that, in fact, there was no negligence, or that it is, in fact, excusable negligence. Defendants pleaded that certain things do constitute negligence that estops the plaintiff to claim what her claim finally became: to wit, that the two instruments should be cancelled, because she had been tricked into signing them, and into the belief that she was signing an application for a loan. This plea of the defendants' was in no manner attacked.

"Under familiar rules, if matter pleaded as a defense is not attacked by motion or demurrer, and there is testimony to sustain it, it will defeat the action, although it may not have amounted to a legal defense." *First Nat. Bank v. Zeims,* 93 Iowa 140, at 143 (citing *Conger v. Crabtree,* 88 Iowa 536; *Linden v. Green,* 81 Iowa 365; *Benjamin v. Vieth,* 80 Iowa 149). And see *Enix v. Iowa Cent. R. Co.,* 114 Iowa 508; *Ormsby v. Graham,* 123 Iowa 202, at 211; *Heiman v. Felder,* 178 Iowa 740, at 751; *Boyd & Williams v. Watson & Co.,* 101 Iowa 214, at 222; *Lacy v. County of Kossuth,* 106 Iowa 16. So it becomes the controlling question just what defendants asserted created such estoppel, and whether that assertion was proved. If the facts relied on for the estoppel in said unchallenged plea are established, there is an estoppel, though the facts pleaded do not, in truth, create such estoppel.

By adopting all allegations of the original answer, an amendment to answer repeats a denial of the bad faith charged in the petition, worked by declaring that the purchase was made in good faith. To say at this point that defendants proved good faith would beg the question. Therefore, I content myself with saying that the plea of good faith was an immaterial one, and need not be proved. For, in a suit for affirmative equitable relief, a defendant who is not an innocent, has as much defensive standing

as has one who is. As for the rest, the amendment express-ly bases an estoppel plea upon nothing but the allegation that plaintiff signed while she was "a person who could read and write * * * and is a person who is and was at the time of the execution of said instrument competent to know and understand the nature and effect and meaning of the same;" and that she was further negligent because, by so signing and by delivery to Hamilton, she put it in his power to sell the instruments. It will not be claimed that this allegation is not absolutely proved. So this estoppel, which is given no consideration by the majority, should alone reverse.

The only answer by the majority is that there was not, in fact, a good plea of estoppel, because the case is dealt with as a claim that one who knowingly signed a note was defrauded. First, it may not so be dealt with because the petition makes the suit one in which no paper knowingly signed is involved. Second, even if the plea of estoppel be not, in fact, good, failure to attack makes it good. This last, the majority leaves untouched.

### 5a

Still another estoppel is pleaded; and it, too, seems not to have had any consideration. It does not inject good or bad faith, at all; and, of course, this made it unnecessary, in aid of the estoppel, to prove good faith, even if good faith were material. It is based upon allegations that plaintiff is estopped by laches, because she made no inquiry whether her money had come, and remained silent until Hamilton withdrew his money from defendant bank, and absconded. Every word pleaded was proved. This state of pleading and proof is alone a warrant for reversal.

Of this plea, nothing is said, except that Hamilton was financially worthless, and that plaintiff owed no duty to warn these who had bought by bad faith. Assume this

proves the plea is, in fact, bad, how does that answer the unanswerable position that the plea, as made, and which did not negative what the majority points out, was in no manner assailed?