# D. L. CASE v. GILL FEVIG.[1]

October 7, 1932.

No. 29,002.

*Stinchfield, Mackall, Crounse, McNally & Moore* and *Lawrence, Murphy, Fuller & Powers,* for appellant.

*Christian G. Dosland,* for respondent.

WILSON, C. J.

Plaintiff appealed from a judgment.

O. A. Knutson owned and operated a grain elevator at Ulen, Minnesota, about 200 miles northwest from Minneapolis, wherein The Tenney Company (hereinafter referred to as the company), a grain commission corporation, had its main office. The company furnished money to Knutson to buy grain for it. Prior to June 1, 1928, Knutson misappropriated the company's money. The amount of the defalcation is not disclosed. On June 11, 1928, Knutson transferred his elevator and his home to the company. Its attorney then suggested that Knutson see what he could do toward raising money to make good the shortage. One Pemble, an em-

[1]Reported in 244 N. W. 821.

ploye of the company, suggested that Knutson go to a number of his friends in his home community and get them to sign and give to him accommodation notes for $100 each and deliver such notes to the company to cover the defalcation.

Knutson got 37 notes for $100 each, six for $50 each, and one for $1,000. Thirty-two of these notes were dated June 11, 1928, 12 were dated June 17, 1928, and all were due in one year from date. Knutson delivered these notes to the company. The makers all resided in or near Ulen.

On June 7, 1929, the treasurer of the company telephoned the First National Bank of Minneapolis, talking with one of its vice presidents, and sold these notes, totaling $5,380, principal and interest, to the bank with recourse. The note here involved was included in this purchase. The bank gave the company credit therefor in its checking account, and it forthwith thereafter duly availed itself of the full amount of this credit.

The vice president testified that when he bought the notes neither he nor the bank had any knowledge of any defenses or infirmities in these notes and that they had no reason to suppose that there were any valid defenses to them; that the company had been a customer of the bank for many years and the purchase of these notes was an ordinary occurrence in the relation between the bank and the company; that the transaction was not out of the ordinary.

When the notes matured the bank notified the makers, but got no response. Thereafter it notified the company and advised that it would charge these notes to its account unless it cared first to make additional collections. The company advised the bank to dispose of the notes to the best advantage and charge to their account any balance which might be left. The bank then sold all the notes to plaintiff for $2,000, charging the loss of about $3,400 and interest to the account of the company. This sale was discussed with plaintiff in October, 1929, but it was not completed until March 11, 1930, when the notes were delivered to plaintiff, he having given a demand note for the $2,000 with interest from the time he received the notes.

After the notes were due, an attorney representing the company was at Ulen attending a meeting of the makers of these notes. He

was there in an effort to get an adjustment or settlement of the matter. He sought new notes in place of the "bad" ones. This attorney is a member of one of the firms of lawyers which now represents plaintiff in this action, but he was not present at the trial of the cause.

The trial court held that it was for the jury to say from all the evidence, the facts, and the circumstances whether or not the bank was a good faith purchaser.

In getting these notes Knutson told his friends, the makers, that he wanted to use the notes for credit so that he could carry on his business. He did not tell them the true purpose for which he was getting them, but did tell them that he wanted them to use as collateral to obtain credit to buy grain, and he would use them for security to be left either at the elevator office or at the bank. The makers knew that they were signing notes to be used by Knutson for credit. Whether there was in fact fraud in this respect we do not decide, but will assume that Knutson procured the notes by fraud and that because thereof his title was defective and that he negotiated the notes in breach of faith. See G. S. 1923 (2 Mason, 1927) § 7098. With such assumption we go to the question as to whether the facts and circumstances will sustain a finding that the plaintiff is not a holder in due course and whether or not the record requires a finding to the contrary.

The notes were accommodation paper. What evidence is there to show that the company knew when it accepted these notes that Knutson was guilty of fraud in procuring them or that he was negotiating them in breach of faith? We think there is none.

It is argued that the trier of fact was justified in concluding that the company was not a holder in due course because it knew that Knutson was short in his accounts and that the notes were accommodation notes; that Knutson had given a bond, and that there was a suit pending thereon; that Knutson was called in to the company office in Minneapolis and its attorney there told him that there were grounds "to put him over"; that Knutson turned over his elevator and home; that Pemble suggested he get these notes; that

the attorney for the company met with the makers and spoke of these notes as "bad" notes and there had possession of these notes after their maturity; (this was after the company acquired and sold the notes); and that the company sold the notes four days before maturity.

But these facts and circumstances neither show nor permit an inference that the company had any knowledge of the assumed infirmities of these notes at the time it received them.

It is also argued that the First National Bank was not a holder in due course. This argument seems to rest upon the claim that the bank bought the notes four days before maturity; that the bank should have been suspicious of the company's selling them at a date so near maturity; that the bank took these notes without investigating the financial standing of the makers; that the fact that the notes were all of substantially the same amount should arouse suspicion in the mind of a banker on account of the large number of similar notes and the uniformity of the transaction, it being asserted that the purchase of these notes was not an ordinary banking transaction.

The fact that the bank bought these notes four days before maturity can have little bearing upon the question of its being a holder in due course. This fact does not disclose any notice of infirmities in the paper and does not impair the good faith of the bank. The contention is unsound. It must be kept in mind that the company was apparently a valued customer of the bank. It had sold notes to the bank on other occasions. It sold these notes to the bank with recourse, and we see nothing out of the ordinary or surprising for the bank to permit such a customer's attorney to have the possession of the notes while attempting to negotiate an adjustment or settlement. There is nothing in the record to indicate that the attorney for the company was in any way the attorney for the bank, though he is one of the attorneys for the plaintiff in this action. It was the responsibility of the company to obtain collection of these notes, while the bank held them, on account of its liability as indorser. What the attorney actually said to Knutson before the notes were

given and what he may have said about the notes being "bad" after the maturity of the notes is of no significance. The conduct of the attorney must be considered relative to his relation to his client only and wholly disconnected from the bank. His conduct in no way discredits him. Nor is there any merit in the suggestion that the fact that the bank took plaintiff's note when it sold him the notes can be considered as a circumstance bearing upon the bank's good faith when it bought the notes.

Obviously the bank bought these notes in reliance upon the indorsement of the company. It refused to take them indorsed without recourse. So, relying upon the company's indorsement, there was no necessity of investigation of the makers. Apparently the bank took the notes to accommodate its customer, the company. If there was anything to indicate to the bank that they were accommodation notes, that would not deprive the bank of becoming a holder in due course in the absence of knowledge, actual or constructive, of their infirmities. Grisim v. Live Stock State Bank, 167 Minn. 93, 208 N. W. 805; Tourtelot v. Reed, 62 Minn. 384, 64 N. W. 928. The bank was not bound to assume that the notes were affected by the infirmities now attributed to them. It was not required under the circumstances to make inquiry. First Nat. Bank v. Thompson, 55 S. D. 629, 227 N. W. 81. The presence of the two assumed or conceded infirmities in these notes puts the burden upon plaintiff. But the testimony of the vice president of the bank, with the circumstances in the case, required a finding that the bank was a holder in due course. His testimony is clear, positive, unimpeached, and in no way improbable or contradictory. It must therefore be accepted. O'Leary v. Wangensteen, 175 Minn. 368, 221 N. W. 430; First Nat. Bank v. Van de Putte, 187 Minn. 96, 244 N. W. 416. The evidence shows that the bank acquired the notes in good faith, i. e. in ignorance of the infirmity. Harwood State Bank v. Hendrum Co-op. Elev. Co. 166 Minn. 400, 208 N. W. 24; First Nat. Bank v. Carey, 153 Minn. 246, 190 N. W. 182. It paid value and acquired the notes before maturity. There was no circumstance or fact known to the bank to serve as a danger signal

requiring it to make inquiry, the ignoring of which would amount to bad faith. There was nothing to submit to the jury.

The plaintiff purchased these notes after maturity; and because of that fact alone he would not be a holder in due course. But since plaintiff's indorser, the bank, from whom he bought the notes, was a holder in due course, the notes remain such in the hands of plaintiff, who has not been a party to any fraud or illegality affecting the notes. G. S. 1923 (2 Mason, 1927) § 7101.

The record justifies the conclusion that the company was a holder in due course as a matter of law, and under the statute it would follow that the bank and the plaintiff were holders in due course; but this element was apparently not considered in the trial court, and the status of the company was not submitted to the jury (as was that of the bank) or otherwise passed upon.

The judgment is reversed with directions to enter judgment for plaintiff.