GEORGE W. UNDERWOOD, Appellee, v. HENRY LEICHTMAN
et al., Appellants.

**APPEAL AND ERROR:** Review—Numerous-Pointed Motion for
1   New Trial. Sustaining, generally, a numerous-pointed motion
for a new trial raises the presumption that the court passed
favorably on all the grounds, though some of the grounds are
and some are not specifically referred to in the ruling.

**NEW TRIAL:** Non-Trial Judge—Measure of Discretion. The dis-
2   cretion of a non-trial judge in passing on a motion for new
trial is measured *solely by the record before him.*

**BILLS AND NOTES:** Holder in Due Course—Rescission—Effect.
3   The maker and payee of a negotiable promissory note may not,
as against a holder in due course, rescind the transaction out of
which the note arose; and instructions which authorize the
jury to find a rescission, *without defining the consequences of
such finding,* are prejudicially erroneous.

**BILLS AND NOTES:** Holdership in Due Course—Jury Question.
4   The issue of holdership in due course is carried to the jury by
evidence that the purchaser (1) did not ordinarily buy com-
mercial paper, (2) made no inquiry about the note when he
bought it, (3) inquired, before purchase, of his attorney as to
possible defenses, (4) bought the note for one third its face,
and "without recourse," and (5) acknowledged, at the time,
that the purchase was "risky."

*Appeal from Chickasaw District Court.*—A. N. HOBSON and
C. N. HOUCK, Judges.

MARCH 16, 1920.

ACTION on promissory note. The issues of fraud in its
inception, and bad faith on the part of the plaintiff in ac-
quiring it, were raised by the pleadings. The jury returned
a verdict for defendants, which, on motion for new trial,
was set aside, and another trial ordered. The defendants
appeal.—*Affirmed.*

*R. Feyerbend* and *M. F. Condon,* for appellants.

*M. E. Geiser,* for appellee.

LADD, J.—In January, 1916, the defendants left Chickasaw County, to examine lands near San Benito, Texas, advertised for sale by the Santa Clara Plantations Company. After reaching Kansas City, Missouri, they were accompanied by E. F. Hall, president of that company, and by him shown the country from an automobile. According to their account, they were, figuratively speaking, taken up into a high mountain, and shown possibilities beyond the dreams of avarice,—soil impossible to exhaust, producing as much as five crops a year, yielding, when seeded to alfalfa, ten cuttings per annum, of a ton each, and worth $17.50 a ton, an average of $500 to $900 worth of cotton per annum; and other like representations. They entered into a contract with the company for the purchase of 40 acres of land at $200 per acre, and, as earnest money, executed their promissory note of $3,200, dated January 1, 1916, payable April 1, 1917, bearing interest at the rate of 6 per cent per annum. The remainder of the purchase price was to be paid in nine equal annual installments, evidenced by notes, and secured by vendor's lien in the deed, which was to be executed on payment of the note first mentioned. The company sold the note of $3,200 and a farm of 50 acres, near New Hampton, subject to a mortgage of $3,000, to plaintiff for $6,000, December 29, 1916, and, in this action, the latter prays judgment against defendants for the amount of this note. In a substituted answer, the makers allege that the note, as well as the contract for the purchase price of the Texas land, was procured by fraud practiced upon them by Hall and Wilkins, as officers of the company, in knowingly misrepresenting the land, as above indicated, and in other respects; that the representations were false, but were relied upon by defendants in making the purchase. Rescission by mutual

consent also was pleaded. The allegations of the answer were put in issue by the reply, which alleged that the note was purchased from the payee therein named, before maturity, for valuable consideration, and without notice of any infirmities therein or defect of title, and that, in so obtaining same, plaintiff acted in good faith; and that defendants are estopped from claiming a rescission of the contract, or from interposing the defense set up in the answer. After all the evidence had been introduced, and the counsel for plaintiff had made his opening argument, and the arguments of counsel for defense had been concluded, defendants filed an amendment to their substituted answer, alleging that "there was a total or partial failure of consideration for said note, sued on in this action." Motion to strike this was overruled; and, after the closing argument, the cause was submitted to the jury. Verdict was returned for defendants. Some days later, a motion containing 12 grounds, to which 2 were added by way of amendment, was filed. This happened at the March, 1918, term. Shortly afterwards, the presiding judge, Hon. A. N. Hobson, departed this life, and the motion was not ruled on until the following October, when the court, his successor, Hon. C. N. Houck presiding, sustained the motion, by setting aside the verdict and ordering a new trial. The appeal is from this ruling.

I. The opinion of his honor was filed, disclosing that he regarded the sixteenth instruction as erroneous, and that, in his opinion, the evidence conclusively proved that plaintiff had acquired the note in controversy for

1. APPEAL AND
ERROR: review:
numerous-
pointed motion
for new trial.

a valuable consideration, without notice, and in good faith; but this opinion did not refer to the other grounds of the motion. The motion was sustained generally, and, for this reason, the court must be assumed to have passed on each of the 14 grounds assigned, though without indicating his reasons for

sustaining any except those mentioned. *Thomas v. Illinois Cent. R. Co.,* 169 Iowa 337; *McDonald v. Mutual Life Ins. Co.,* 178 Iowa 863.

II. The circumstance that a judge, other than the one presiding at the trial, passed on the motion for a new trial, does not warrant a modification of the rule according the trial court a large discretion in determining

**2. NEW TRIAL:** whether another trial should be granted. It
**non-trial judge:** does limit the scope of inquiry, however, to
**measure of discretion.** the record before him. He may not take into consideration the happenings during the trial not made of record, the appearance and conduct of the witnesses, and the like, including what is known as the atmosphere of the court room. On the other hand, a broader discretion is accorded the trial court than may be exercised by a mere reviewing tribunal court. As said in *Hughley v. City of Wabasha,* 69 Minn. 245 (72 N. W. 78):

"Where a motion for a new trial is made before a *nisi prius* judge, in a cause which has been tried before another judge, or before a referee, he [the judge presiding] has the right, and it is his duty, to exercise the same discretion in determining whether the motion should be granted as if the cause had been tried before himself, with the proviso or qualification, however, that such discretion must be exercised entirely with reference to the evidence disclosed by the record, as he can know nothing else as to what occurred or appeared on the trial."

See, also, *Reynolds v. Reynolds,* 44 Minn. 132 (46 N. W. 236). The court's discretion, then, must be measured solely by the record before us.

III. Defendants alleged a mutual rescission, and the evidence tended to show that, early in March, 1917, Wilkins informed defendants that the company would not perform

its part of the contract, and that, later in

**3. BILLS AND
NOTES: holder
in due course:
rescission:
effect.**

the month, defendants informed the company that they would not perform. With reference to this evidence, the court instructed the jury (sixteenth paragraph of the charge) that:

"You are instructed that, if you believe from a preponderance of the evidence that the note and contract for purchase of land in controversy herein were procured by fraud, and that, in the month of March, 1917, O. L. Wilkins, president of the company, informed defendants that said company did not intend to perform its part of the contract, and that afterwards, in the same month, defendants informed said company that they would not pay said note, nor perform its contract with said company, this would constitute a rescission of the contract, and if you do not find such facts so established, then you should not find such rescission."

The jury was not advised what bearing its finding would have on the liability of defendants. As plaintiff purchased the note more than two months previous to any talk of nonperformance of the contract, there seems to have been no good reason for injecting this issue into the case. Section 3060-a26 of the Code Supplement, 1913, provides that:

"Where value has at any time been given for the instrument, the holder is deemed a holder for value in respect to all parties who became such prior to that time."

The instruction, however, opened the door for a finding by the jury that the contract had been rescinded by mutual consent, and for the deduction therefrom that the consideration for the giving of the note had failed. Such failure of consideration was pleaded by defendants in an amendment immediately preceding the closing argument, and, in overruling a motion of counsel for plaintiff to strike, the court observed that:

"The proposed amendment is in the nature of meeting

the proof already in the case, and makes the pleadings conform, in a measure at least, to the proof already adduced.

The only evidence bearing on the issue raised by the amendment was that tending to prove mutual rescission, and there is no escape from the conclusion that the instruction, given without defining the consequence of a finding thereon, constituted error, and that such instruction may have been extremely prejudicial, as the jury could have found there was a rescission, and hence, failure of consideration, and based thereon their verdict for defendants.

IV. We are not ready, however, to agree with the trial court's conclusion that the evidence conclusively established the plaintiff's good faith in obtaining the note. The evidence was ample to carry to the jury the issue as to the perpetration of fraud by the payee in obtaining the note, and that body might have found the Santa Clara Plantations Company's title defective, within the meaning of Section 3060-a55, Code Supplement, 1913. If the jury so found, then the burden was on plaintiff to prove that he, or some person under whom he claimed, acquired title for value and without notice and in good faith.

**4. BILLS AND NOTES: holdership in due course: jury question.**

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Section 3060-a56, Code Supplement, 1913.

Here, the evidence tended to show that the plaintiff was "a real estate man and investor;" that, as a rule, he did "not buy commercial paper;" that he knew, "about two or three weeks or a month before he bought the note, that they had it,—it might have been two months;" that he did not know of the existence of the company named as payee, at that

time, nor that Wilkins,· who endorsed the note as vice-pres·
ident, was such officer; that he had counted Leichtman a
good friend for many years, though the payee in the note was
a stranger; that he made no inquiry of him concerning the
note, even though both lived in the same place, and was
aware that he had dealt in Texas land; that, before dealing,
he took the advice of his attorney as to whether any de-
fense could be interposed to the note; also, that he had his
attorney investigate Leichtman's financial condition, and
ascertained that he owned 600 acres of land, on which there
was an incumbrance of $51,000. According to plaintiff's
testimony, this land was worth $30,000 above the incum-
brances; but the evidence was such that the jury might have
found its value to have been $45,000 in excess of the mort-
gages thereon. The jury also might have found that the
50 acres of land which he received were worth $100 an
acre, the price for which he sold it, early in 1917. This
indicated the purchase price of the note, about two month's
before maturity, to have been $1,000, or a little over 30
cents on the dollar. Reineke, purchaser of the farm, testi-
fied that, in negotiating the deal, plaintiff remarked: "You
would not have bought that, such risky papers as I did, pay-
ing that price for it,—a big amount;" and that "it was quite
a risk to run and you would not have done it." The
plaintiff admitted this testimony to be substantially cor-
rect, and explained that he had had reference to the extent
of Leichtman's indebtedness, and did not refer to the in-
ception of the notes. The jury might also have found that
defendant had acted as agent of the company, and that
plaintiff knew this. The note must have been endorsed
prior to March, 1916, as Wilkins became president of the
company at that time. Plaintiff says that the note was en-
dorsed by Wilkins as vice-president, when first presented to
him, and not until in the evening at the hotel when the
transfers were made was "without recourse" written above

the endorsement. In view of these circumstances, it need hardly be added that it was for the jury to say whether it would accept or reject plaintiff's testimony that he obtained the note in good faith, and without notice. The burden was on him to show that he acted in good faith, and not on the defendants to establish his bad faith. We have, then, this situation: A person not in the business of buying commercial paper, knowing that the same has been for sale, several weeks at least, and that the maker is possessed of property amply sufficient to pay the same, purchasing the note at less than one third of its face value, but so doing after inquiring of his attorney whether any defense might be interposed, and with knowledge that the note purchased was being sold by one who had employed the maker as his agent, and that the seller, at the last moment, had endorsed it "without recourse," and making the subsequent statement to a third person that the purchase of the note "was quite a risk to run." Surely, such a state of facts, if found, would cast suspicion on the plaintiff's testimony that he acted in good faith, and might have led to the conclusion that he knew of the infirmity alleged, or, if he did not know, that his omission to make inquiry arose from a belief or suspicion that inquiry would disclose such infirmity in the instrument as would defeat recovery thereon. See *Lundean v. Hamilton,* 184 Iowa 907. It may be that we have omitted some of the extenuating circumstances. Our aim has been merely to set out enough to demonstrate that this issue was for the jury. The court granted a new trial because of the error in the sixteenth instruction, and its order in so doing is—*Affirmed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.