RACHEL A. ELZY et al., Executors, Appellees, v. WATERLOO, CEDAR FALLS & NORTHERN RAILWAY COMPANY et al., Appellants.

**DAMAGES: Nonmutual Agreement for Liquidated Damages.** A contract will not be construed as calling for liquidated—stipulated—damages:

   1. When *one* party to the contract has the right to demand such damages, but the *other* party has no right to discharge himself by paying such damages; or

   2. When from all the circumstances it is debatable whether the parties contracted for such damages.

**PLEADING: Unassailed Defense.** Principle reaffirmed that a pleaded and established defense which is unquestioned in the trial court is unassailable on appeal.

*Appeal from Benton District Court.*—B. F. CUMMINGS, Judge.

JUNE 25, 1921.

SUPPLEMENTAL OPINION OCTOBER 25, 1921.

REHEARING DENIED MARCH 11, 1922.

ACTION at law, to recover upon written contracts for the grading of the roadbed of a railway between the cities of Waterloo and Cedar Rapids. There was a trial to a jury. At the close of the testimony, the plaintiffs on their part and the defendants on their part moved for a directed verdict. The court sustained both motions, each in part, with the net result that plaintiffs were awarded a recovery in the sum of $17,095.54. From this ruling and from the judgment entered on the directed verdict, the defendants appeal. So far as the same are necessary to an understanding of the questions raised upon this appeal, the material facts are stated in the following opinion.—*Affirmed.*

*Nichols & Nichols* and *Edwards, Longley, Ransier & Harris,* for appellants.

*F. E. Northup* and *Tobin, Tobin & Tobin,* for appellees.

WEAVER, J.—The printed records in this case are very voluminous, but counsel in argument have narrowed the questions on which we must pass within comparatively small compass,

1. DAMAGES: non-mutual agreement for liquidated damages.

making it unnecessary for us to indulge in extended discussion of the facts.

Briefly outlining the situation of the parties at the date of the contracts between them, it should be said that the defendant railway company, having undertaken the project of building an electric railway from the city of Waterloo to the city of Cedar Rapids, let the contract for the construction of such improvement to its codefendant, the Cedar Valley Railway Construction Company, which company in turn sublet the work for grading the roadbed to R. A. Elzy, since deceased. For some reason, this work of grading was let to Elzy in four distinct parts, each part being made the subject of a distinct written agreement. The contract for the first of these parts, extending from Waterloo to La Porte, dated April 19, 1912, was to be completed September 1, 1912; the second contract, dated August 20, 1912, was for the grading from La Porte to Urbana, to be completed to Brandon June 1, 1913, and to Urbana July 1, 1913; the third contract, dated September 8, 1913, was for the grading from Urbana to Center Point, to be completed April 15, 1914; and the fourth and last contract, dated January 6, 1914, provided for the completion of the grade from Center Point to Cedar Rapids June 1, 1914. The said several sections of grading were not all completed within the contract periods, but the work as a whole seems to have been finally and formally accepted on September 5, 1914; and the contractor, Mr. Elzy, died on the following day.

The plaintiffs, as executors of the Elzy estate, engaged in a somewhat prolonged effort to effect a settlement with the defendants, who, while expressing a willingness and desire to pay whatever was justly due the estate, found themselves hampered, for the time being, by unfavorable conditions in the money market. In November, 1914, counsel for plaintiffs prepared a statement of their claim, ready for filing a mechanics' lien, but, before placing it upon record, interviewed the defendants again upon the subject of a settlement. Defendants again pleaded the difficulty they were experiencing in obtaining the needed funds,

but strongly objected to the filing of a lien, and finally, to avoid that movement, and in consideration of a waiver of the right to file such lien, the railway company executed and delivered to plaintiffs its bond or guaranty, with individual sureties, conditioned for the faithful performance and complete payment on part of the Cedar Valley Railway Construction Company for "any and all sums that may be found due to the R. A. Elzy estate for labor performed and materials furnished in the construction of the Waterloo, Cedar Falls & Northern Railway Company from Waterloo to Cedar Rapids. The time of payment of such claims found to be due the R. A. Elzy estate is left indefinite on account of the present banking conditions and the uncertainty of the money market, but it is understood and agreed that the railway company will turn to the account of the Elzy estate any spare money which it may be able to get from the earnings of said company or from any other source, and will complete the payment as rapidly as it possibly can."

On August 31, 1917, this action was begun at law, to recover the alleged unpaid remainder of the claim due the estate. The issues, as at first defined by the pleadings, were very numerous; but in the course of the trial below, many minor matters of dispute were eliminated or abandoned, and defendants' appeal to this court is limited to the single proposition that the trial court erred in refusing to assess liquidated damages against the Elzy estate. In their brief, counsel for appellant state the question thus:

"Did the contract provide for liquidated damages in case of default in the time of performance, or did it provide for a penalty only? If it provided for a penalty only, it is to be conceded, without more ado, that the action of the court was correct, because it was admitted that the amount of actual damages was not attempted to be proven."

By the ruling of the trial court upon the motions for a directed verdict, the plaintiffs' recovery was for moneys alleged to be due them upon the claims stated in Count 4 of Division 4 of their amended and substituted petition, which is based upon the contract covering the grading of the roadbed from La Porte to Urbana. Stated in the aggregate, it is there charged that Elzy's earnings under this contract were $102,259.28, against

which defendants were entitled to credit in the aggregate sum of $87,561.46.

Answering this claim, the defendants' admit Elzy's earnings under this contract and the credits due to the defendants thereon to be as alleged, but aver that the remainder due from defendants upon such account should be reduced by the further sum of $12,600, as liquidated damages because of the contractor's failure to complete the work within the agreed time. Upon this contention the court below ruled against the defendants, and upon this holding the principal error argued is assigned.

I.   Whether a given contract is to be construed as providing for liquidated damages is not always easy of determination. Counsel for appellant frankly concede upon this question that:

"The court will not necessarily be concluded by the language used in the contract, but will scrutinize the whole contract, the subject-matter thereof, and the extraneous facts tending to make clear the real nature of the stipulation. Neither the use of the word 'liquidated' or the words 'liquidated damages' nor the fact that the actual damages would be difficult of proof, nor even the intention of the parties to actually provide for liquidated damages, will necessarily control such construction. Doubts will be resolved against the allowance."

This is, of course, not a concession that such circumstances are to be ignored; for they are both relevant and material, and to be given due consideration for what they are fairly worth, in arriving at a conclusion whether, upon the record as a whole, and under the settled rules of law upon the subject, the contract under investigation does or does not provide for stipulated damages.

At the outset upon this question, let us look to the particular clause of the contract which appellants quote as the foundation of their claim for such damages. The language so selected by counsel is that:

"The contractor specifically agrees to pay to the railway company as liquidated damages the sum of $50 for each and every day from and beyond June 1, 1913, that the grading from La Porte to Brandon remains unfinished and $50 for each and every day from and beyond July 1, 1913, that the grading from Brandon to Urbana remains unfinished, and it is specifically

understood and agreed that the railway company may reimburse itself for the full aggregate amount of sums named for either or both of these defaults from any money or moneys remaining in its hands, and owing the contractor under the terms of this agreement, but should the railway company so elect it may bring action in any of the courts of this state to collect said amounts due under said defaults.''

Now, the language so quoted and relied upon by appellants does appear in the contract, but counsel omit therefrom very much matter without which its legal effect cannot be fully comprehended. The entire contract, as executed, contains 24 distinct paragraphs, and it is in the twelfth of these that we find the quoted clause. This paragraph is very long, and not a little complicated; but the bulk of its many provisions has, as we think, a decisive bearing upon the vital question presented by the appeal, and at the risk of making our opinion tedious, we here quote it in full.

''Payment of Labor.

''12. Under the terms and conditions of this agreement, the contractor shall have until June 1, 1913, to complete the grading from La Porte to Brandon, and until July 1, 1913, to complete the grading from Brandon to Urbana, but in case the contractor by use of more equipment, of men, teams, and machinery, or in any other manner, succeeds in completing the entire job of grading from La Porte to Urbana as contemplated by this contract on or before December 20, 1912, then and in that event, the railway company specifically agrees to pay the contractor, in addition to the sums provided for by this contract, the further sum of $7,500 cash, which amount shall be the only additional payment required from the railway company in consideration of the contractor completing all the work on or before December 20, 1912, nor shall any of the above mentioned additional $7,500 be due or payable should the grading be completed subsequent to December 20, 1912, but prior to the above dates of June 1, 1913, and July 1, 1913.

''On the other hand, however, and *in consideration* of the railway company's agreement to pay the further sum of $7,500 should the grading be finished on or before December 20, 1912,

the contractor specifically agrees to pay to the railway company as liquidated damages the sum of $50 for each and every day from and beyond June 1, 1913, that the grading from La Porte to Brandon remains unfinished, and $50 for each and every day from and beyond July 1, 1913, that the grading from Brandon to Urbana remains unfinished, and it is specifically understood and agreed that the railway company may reimburse itself for the full and aggregate amount of sums named for either or both of these defaults from any money or moneys remaining in its hands and owing the contractor under the terms of this agreement, but should the railway company so elect, it may bring action in any of the courts of this state to collect said amounts due under said defaults, and contractor specifically agrees in that case to pay in addition to the sum specified the costs of such action including reasonable attorney fees. *Or, as an alternative to the penalties above set forth,* should the contractor at any time before the completion of the work make default in the performance of this contract, or of any of the stipulations or terms hereof or should, in the opinion of the engineer, the work not be proceeding with sufficient rapidity for the proper performance of the work within the time specified, the railway company may cause a written notice to be served on the contractor, calling attention to the default, neglect, or delay to which exception is taken, and requiring the contractor to increase the amount of work being done to such rate per month as will enable him to complete the work within the specified time. And, as to whether or not the contractor under this article has increased the amount of work being done at such a rate per month as will enable him to complete the work within the specified time, and as to whether or not the contractor is properly prosecuting the work, shall be questions to be determined by the chief engineer of the party of the first part, and his judgment with reference thereto, shall be binding upon both parties to this contract. Then and in the event the contractor should fail to so prosecute the work in accordance with the requirements of this contract, and the above mentioned *written notice, it shall be lawful for the railway company, upon the expiration of two weeks from the date such notice was given, to declare this contract terminated and on such declaration being made in writing by the railway.*

*company,* or its authorized officer or agent, to the contractor, or to the representative of the contractor in charge of the work, *the right of the contractor to do any further work under this contract shall immediately cease and determine, and the railway company may retain the before mentioned reserved percentage, together with any unfinished estimates or moneys due the contractor until the completion of the work, and may reimburse itself therefrom for any damages which the railway company may sustain by reason of the nonperformance by the contractor of this contract.* In estimating such damages are to be considered the salaries and expenses of the engineers and any employees of the railway company engaged in the work, any additional expenses incurred in maintenance and operation by the railway company, the delay of the railway company in obtaining the use of the work, *and any legal damages that may be shown as arising from such nonperformance; or, as an alternative to such declaration, the railway company shall at its election, have the right to cause such portions of the work as the engineer may designate, to be performed by the agents or employees of the railway company; or, as an additional alternative thereto, at its election the railway company may require the contractor to employ such additional men, carts, teams, machines, etc., as the railway company may be able to procure,* in either of which cases the railway company shall have the right to retain from the amount of the estimates payable to the contractor, as provided in Article Nine (9) an amount sufficient to defray the cost and expenses of the measures so taken; or, as *a further alternative thereto,* the railway company shall have the right and it is hereby authorized, should it so elect, to enter upon and take possession of the work, and of all the teams, machinery, tools, and equipment of whatever character thereon belonging to the contractor and to use the same to complete the work or any part thereof with its own agents or employees or at its option, the railway company may relet the work so equipped as a whole or any part thereof and the contractor shall not have the right to remove or cause to be removed from the work or any part of it, any or all of his teams, machinery, tools, and equipment of whatever character until the final completion of the work to the satisfaction of the chief engineer of the party of the first part.

And, further, the railway company shall not be responsible to the contractor in any manner whatsoever for or on account of the manner or means employed by it for completing or causing the work to be completed. And the railway company is hereby authorized and empowered to use and employ any or all of the before-mentioned reserved percentage, together with any unfinished estimates or other moneys due the contractor, to reimburse itself on account of the cost of completing or causing the work to be completed and on account of *other resulting damages* before mentioned. And further upon the final completion of the work, if it shall have cost the railway company an amount greater than that it would have been required to pay to the contractor therefor under the terms of this contract, the contractor shall pay or cause to be paid to the railway company an amount equal to the difference between the actual cost of completing the work and the amount the railway company would have been required to pay the contractor therefor under the terms of this contract. *In all cases the railway-company shall be entitled to reimbursement by the contractor to the full extent of the damage or loss arising to the railway company by default of the contractor under this contract. Should the railway company avail itself of any of the remedies herein above described as an alternative to the penalties of fifty dollars ($50) per day for failing to complete the grading to Brandon on or before June 1, 1913, and of fifty dollars ($50) per day for failure to complete the grading to Urbana on or before July 1, 1913, then and in that event, the right of the railway company to collect said penalties shall cease and determine, but otherwise it shall remain in full force and effect, but it is understood and agreed that the serving of the written notice herein above mentioned or any other act of the railway company except the actual carrying out of the one or more of the said alternatives shall not relieve the contractor from the payment of said penalties.* It is of the essence of this contract that the rate of progress of the work shall be such as to enable the contractor to complete it within the period of time specified in Article One (1) and that it shall be completed on the dates therein specified.''

To be valid and enforcible, an agreement for stipulated damages, like all other contracts, must expressly or impliedly

provide for mutuality of obligation. Such agreements, in theory at least, are intended for the mutual benefit of both parties, and the right of one to demand and receive a specified sum of money as damages for the other's default is no more imperative or indisputable than is the right of that other party to be relieved from such liability by payment of the stipulated sum, even though it may happen that the actual damages occasioned by his default are largely in excess of the amount so stipulated. But nowhere buried in the mass of verbiage filling this Paragraph 12 of the contract do we find such essential element of stipulated damages. True, we do find there the words quoted by counsel on which appellants rely as an undertaking by the contractor to pay the company $50 liquidated damages for each and every day from and beyond a named date that the designated grading remains unfinished; but it nowhere expresses or implies any corresponding obligation on the company's part to accept such stipulated sum or sums in satisfaction of its damages on account of the default. On the contrary, it expressly reserves to the company the right, if it shall so elect, to discard the stipulation for damages, and to insist upon satisfying its claim upon another basis and by other means.

To a brief *résumé* of these reservations or alternatives we prefix the final clause of the paragraph, as casting light upon the company's own conception of the nature and effect of the reserved alternatives. It reads as follows:

"*In all cases,* the railway company shall be entitled to reimbursement by the contractor *to the full extent of the damages or loss* arising to the company by default of the contractor under this contract. Should the railway company avail itself of any of the remedies herein above described as an alternative to the penalties of $50 per day for failing to complete the grading * * * then and in that event the right of the company to collect said penalties shall cease and determine but otherwise it shall remain in full force and effect; but it is understood and agreed that the service of the notice hereinabove mentioned or any other act of the company except the actual carrying out of one or more of said alternatives shall not relieve the contractor from the payment of the penalties."

It will thus be seen that, while appellants now insist that

Elzy was in default for an aggregate of 252 days at $50 per day, there was not a minute from the beginning of that period until the hour of Elzy's death that he knew or could have known to what measure of liability the defendants would attempt to hold him. They had fortified themselves behind a barrier of "alternative" remedies by which, if it be held that this contract provides for stipulated damages, the company could, without proof of any loss or injury, recover against him a money judgment to the amount of $12,600, or could declare the contract terminated, and exclude him from further pursuance of the work, and retain all moneys owing and unpaid to him, and use them to reimburse itself for *any damages sustained* by it by reason of the nonperformance of the contract; and in estimating such damages, it could include salaries and expenses of the engineers and employees of the company, *and any legal damages* arising from such nonperformance of the contract; or it could take possession of the work by its own agents and employees; or it could require the contractor to employ additional men, teams, tools, and machinery; or it could withhold the earnings of the contractor, to defray the costs and expenses so incurred; or it could elect to take actual possession of the work and of the contractor's entire outfit of teams, machinery, tools, and equipment, and use the same in completing the work, and from the unpaid earnings of the contractor it could reimburse itself for expenses in completing the work *and other resulting damages* before mentioned.

All these alternatives were open to the defendants to the last moment; and if the situation had proved to be such, or if at any time they believed that, by taking advantage of any one of the alternatives, they could exact greater damages than could be assessed under the alleged stipulation, there was nothing in their contract to prevent their doing so. It is not necessary, upon this appeal, that we pass upon the validity of such an agreement. It is enough here to say that it cannot be construed as providing for stipulated damages.

II. While our conclusion, already stated, necessitates an affirmance of the judgment below, we think that the result is easily sustainable on other grounds. So far as concerns the subject-matter of the contract and the importance of the work

which Elzy undertook to perform, it may be conceded that they were of such magnitude that, if the alleged agreement for stipulated damages were otherwise clearly established, the court would not feel authorized to deny its validity on the mere ground that it is unreasonable, or out of due proportion to the interests at stake. But we think that, upon the record as it stands, the case falls well within the rule stated by appellants' counsel, that the construction of a contract to determine whether a given provision shall be held to provide for liquidated damages or for a penalty is not necessarily controlled by the mere words in which the stipulation is framed, but that attention will be given to all relevant admitted or proved circumstances, and in so doing, doubts will be resolved against the allowance. We doubt if any disinterested and intelligent reader of that paragraph of the contract which treats of the matter can say that there is no doubt of the intention of the parties to provide for fixed damages. Again, the attitude of the parties toward each other, their manner of dealing with each other with reference to the work, and more particularly the apparent mutual practical construction placed by them upon the terms of their contract, indicate that neither party intended or expected them to be enforced with strict and literal exactness. These concessions were by no means all on one side. The road was quite evidently being constructed under adverse circumstances; the monthly estimates due from the company to the contractor were quite uniformly in arrears; and the slowness of the advance in the work of grading was often aggravated by the failure of defendants and their engineers in clearing the way for Elzy and his subcontractors. We shall not stop to go into details upon these matters. It is enough to say that there appear to have been faults and failures by both parties, as well as a liberal degree of mutual forbearance, and that, on the whole, the extrinsic circumstances having any legitimate bearing upon the main question discussed by counsel tend most strongly to negative the inference of any agreement for liquidated damages.

III. Counsel on both sides have given very considerable attention to the question whether, assuming that there was a stipulation for fixed damages, such provision was not waived by the parties. Had we found that there was a provision for

stipulated damages, and that the question of waiver was in the case, we should then have to inquire whether that issue was not for the jury, thus making a reversal and new trial inevitable. Since we have, however, found against the defendant's theory of liquidated damages, the issue of waiver is out of the case, and the only value of the evidence offered upon that point is for the support it may afford, if any, to the trial court's finding that no liquidated damages were ever agreed upon. We understand counsel to concede that the judgment of the trial court was based upon its finding that no agreement for stipulated damages was proven, and not upon any finding of waiver. In such ruling there was no error; and, there being no evidence to sustain a recovery for actual damages, the judgment appealed from must be, and it is,—*Affirmed.*

EVANS, C. J., PRESTON and DE GRAFF, JJ., concur.

### SUPPLEMENTAL OPINION.

PER CURIAM.—In their petition for rehearing, the appellants, among other things, complain that, in the opinion heretofore filed, affirming the judgment below, this court failed to notice or discuss certain counterclaims, numbered 2 and 3, pleaded by the defendants, on which the trial court directed a verdict in plaintiffs' favor. It is to be admitted that this omission was made. The counterclaims mentioned include three items for payments alleged to have been made by defendants for materials and supplies furnished by third persons to subcontractors, for which the principal contractor, Elzy, was liable. These payments were as follows: To the Ellis Lumber Company, $300; to J. F. Meyocks, $125.10; and to St. Clair & Rawson, $126.04. Answering these counterclaims, the plaintiff, among other defenses thereto, alleged that the several claimants named brought suit on their several demands in the district court of Benton County, making said Elzy and the appellants parties defendant therein, and demanding recovery upon said several items of material and supplies; and that it was there determined and adjudicated, upon demurrer, that neither said Elzy nor his estate was liable on

2. PLEADING: unassailed defense.

said accounts. This answer was not challenged by demurrer or motion; and upon the trial, the truth of the said allegations was conceded by stipulation, as to the claims on account of payments made to Meyocks and to St. Clair & Rawson. Under this record, in so far as payments made to Meyocks and to St. Clair & Rawson are concerned, there was no error in directing a verdict for plaintiffs. The sufficiency of the defense pleaded thereto not having been challenged in the trial court, it is not open to the defendants to raise the question for the first time in this court; and proof or concession of the facts so pleaded is sufficient to sustain the defense, even though, had it been challenged in time, the court must have held it insufficient. See *Benjamin v. Vieth,* 80 Iowa 149; *Lundean v. Hamilton,* 184 Iowa 907, 929; *Heiman v. Felder,* 178 Iowa 740; *First Nat. Bank v. Zeims,* 93 Iowa 140; *Ormsby v. Graham,* 123 Iowa 202, 211.

The same kind of plea was made as to the Ellis Lumber Company item, but we find in the record no testimony or concession to support it; and, as it is admitted that this item was, in fact, paid by the defendants, we are disposed to hold that they should have had credit therefor. That this item did not have attention in writing the original opinion is due to the fact that the contest in the court below and upon submission in this court was centered almost exclusively upon the question whether the contract in suit provided for liquidated damages, and these items of counterclaim received only slight and incidental notice at the hands of counsel on either side.

Subject to the modification here suggested, we find nothing in the petition for rehearing to justify us in reopening the case to further consideration. It is therefore ordered that the amount of the verdict directed in favor of the plaintiff and judgment entered thereon be reduced by the sum of $300, with interest at 6 per cent from January 20, 1915, to the date of the entry of said judgment. As thus modified, the opinion heretofore filed will stand. The costs in this court are taxed to the appellants, except the sum of $25, to be paid by the appellee. Petition for rehearing overruled.